78

United States District Court
Southern District of Texas
FILED

JUN 06 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff<br><br>v.<br><br>GRADY F. HEROLD, SR., Individually and in his capacity as Independent Executor of the Estate of Lillian A. Schwarz (deceased); KATHRYN LOUISE HEROLD; RUBY L. WELLS; DORIS JEAN SHANNON; CAMERON COUNTY, TEXAS; LAGUNA MADRE WATER DISTRICT; CAMERON COUNTY EMERGENCY SERVICES; SOUTHMOST UNION JR. COLLEGE DISTRICT; POINT ISABEL I.S.D.; TOWN OF SOUGH PADRE ISLAND; SOUTH TEXAS I.S.D; CAMERON COUNTY APPRAISAL DISTRICT; STATE OF TEXAS; AND LEGENDARY, INC.; LEGENDARY SPI, INC., and LEGENDARY SPI, LTD.,<br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL NO. B-01-053 |

**ORIGINAL ANSWER OF DEFENDANT LEGENDARY SPI, LTD. AND LEGENDARY, SPI, INC.
TO
UNITED STATES OF AMERICA SECOND AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, LEGENDARY SPI, LTD. AND LEGENDARY SPI, INC., Defendant appearing by its undersigned counsel and file this their Original Answer and would show the following:

## I. Background

1. DEFENDANT LEGENDARY SPI, INC., is a related entity to LEGENDARY, INC. and to Defendant LEGENDARY SPI, LTD. LEGENDARY SPI, INC. entered into a purchase agreement dated November 16, 2001, with the Estate of Lillian A. Schwarz (the "Estate") for the purchase of certain property located in South Padre Island, Texas (the "South Padre Island Property") which is the subject of a foreclosure action in this Case by the Plaintiff. A copy of the contract between the Estate as Seller and Legendary SPI, Inc., as Buyer is attached hereto as **Exhibit A**. The three aforesaid Legendary entities are referred to herein as a group as "Legendary".

2. After beginning its due diligence, it quickly became apparent to Legendary that the South Padre Island Property was not developable and therefore had very little value in its present state. Prior to any development of the South Padre Island Property, any party would be required to resolve numerous regulatory matters including, without limitation, those relating to wetlands jurisdiction, those relating to bulkhead laws, zoning and other environmental laws which were applicable to the South Padre Island Property.

3. It was also apparent to Legendary that the regulatory issues described above could not be resolved without substantial expenditures of time and funds by any potential acquirer of the South Padre Island Property and that the resolution of those issues would likely consume a year or more of effort.

4. Under the terms of the aforementioned Purchase Agreement dated November 16, 2001, Legendary was provided a certain due diligence period in order to determine whether the appropriate permitting could be obtained and the necessary environmental requirements complied with in order for the Property to have a value

equal to that set forth in the Purchase Agreement, or $5.5 million (the "Agreement Purchase Price").

5. Legendary believes that unless that due diligence is completed, the value of the Property will be substantially less than that of the Agreement Purchase Price and any buyer of the Property will take the Property subject to substantial risks as to the ability to develop the Property due to environmental and permitting concerns.

6. The action of Legendary in carrying out its due diligence activities and in seeking permits pursuant to the Purchase Agreement will increase the value of the Property and therefore increase the probability that all parties with an interest in the Property will be paid the true value of their interests.

7. Legendary has expended six hundred twenty nine thousand eight hundred twenty three and 51/100 ($629,823.51) in purchasing the liens held by Cameron County and the Point Isabel Independent School District against the Property, which liens (the "Ad Valorem Tax Liens") have priority over the liens of the United States against the Property.

8. Legendary SPI, Ltd., in its capacity as the holder of the Ad Valorem Tax Liens, objects to the efforts of the United States to sell the Property now on the basis that such action will not result in obtaining the best price for the Property but in fact will be injurious to the economic interests of all parties to this action.

9. That far from the interests of the United States being eroded during the term of the due diligence period, the interests of the United States will be enhanced, as the activity of Legendary in completing due diligence and obtaining permitting for the Property will result in a higher value for the Property and a higher probability of the United States being paid the funds which it is owed in this action.

10. Legendary SPI, Ltd. is the holder of the Ad Valorem Tax Liens and has stepped into the shoes of the ad Valorem taxing authorities in their foreclosure action as to the Property. Legendary is in a position to voluntarily forebear pursuing the foreclosure of the Ad Valorem Tax Liens pending satisfaction of its due diligence requirements pursuant to the Purchase Agreement, and is willing to agree to such a forbearance with respect to the Ad Valorem Tax Liens if the United States is similarly willing to forbear in pursuing its foreclosure action in the instant case to permit the

Purchaser to generate the maximum value for the Property. Accordingly, it is within the power of the United States to eliminate the risk of its lien being foreclosed out through the foreclosure of the Ad Valorem Tax Liens with priority of that over the United States merely by virtue of entering into a mutual forbearance agreement.

## II. Answers

11. Legendary admits the allegations that the United States has a federal tax lien for federal estate tax liability which attaches to the South Padre Island Property in which Legendary holds an interest. However, the Defendant LEGENDARY SPI, LTD., has priority over the United States for the liens purchased by LEGENDARY SPI, LTD. from the ad valorem taxing authorities on April 17, 2002, in the amount of Six Hundred Twenty Nine Thousand Eight Hundred Twenty Three and 51/100 Dollars ($629,823.51) plus eight percent (8%) per year accruing after April 17, 2002. Said first priority is acknowledged in the joint pretrial order at point number 20A.

12. Except to the extent already admitted, Legendary is without knowledge of information sufficient to form a belief about the truth of the remaining allegations contained in the Second Amended Complaint of the United States of America. However, to the extent this Court requires admission or denial of the allegations, Legendary denies every allegation in the Complaint, except to the extent already admitted herein or admitted as part of the joint pretrial order.

WHEREFORE, LEGENDARY, SPI, LTD. requests:

1. The Court not order foreclosure of the U. S. Government's lien at this time.
2. That this Court allow Legendary to complete its due diligence under the aforesaid purchase agreement dated November 16, 2001.

3. In the alternative, if this Honorable Court is going to order a foreclosure of the government's lien, sufficient time be allowed for Legendary to continue its due diligence before said sale takes place.

4. In the further alternative, that the Defendant Legendary SPI, Ltd. be allowed to complete the foreclosure sale for ad valorem taxes as ordered by this Court by an agreed final judgment entered on March 19, 2002 and signed by the Court on March 18, 2002, which ad valorem tax liens are now held by the Defendant Legendary SPI, Ltd.

5. That this Court afford such further relief as this Court shall deem proper.

Respectfully submitted,

**DAVID C. GARZA**
Federal Admission No. 3778
Texas Bar No. 07731400
GARZA & GARZA, L.L.P.
P.O. Box 2025
680 East St. Charles, Suite 300
Brownsville, Texas 78522
Phone: (956) 541-4914
Fax: (956) 542-7403
**ATTORNEY-IN-CHARGE FOR**
**DEFENDANT LEGENDARY SPI, LTD.**
**DEFENDANT LEGENDARY SPI, INC.**
**AND ALSO**
**LEGENDARY, INC.**

**Certificate of Service**

I, David C. Garza , do hereby certify that a true copy of the foregoing Original Answer of Defendant Legendary SPI, Ltd. to the United States of America's Second Amended Complaint has been sent via certified U.S. Mail, return receipt requested on this 6th day of June, 2002 to the following:

Manuel P. Lena, Jr.
Andrew Sobotka
U.S. Department of Justice
Tax Division
717 North Harwood, Suite 400
Dallas, Texas 75201

***CERTIFIED MAIL/RRR***
***NO. 7000 1670 0005 7134 0481***
**AND VIA FAX (214) 880-9741**

David Randell, Asst. Attorney General
Office of the Attorney General of
The State of Texas
Bankruptcy & Collections Division
P.O. Box 12548
Austin, Texas 78711-2548

***CERTIFIED MAIL/RRR***
***NO. 7000 1670 0005 7134 0849***

Larry Sherlock
Chamberlain Hrdlicka White
WILLIAM & MARTIN, APPC
1200 Smith Street, Suite 1400
Houston, Texas 77002-4401

***CERTIFIED MAIL/RRR***
***NO. 7000 1670 0005 7134 0832***

Kent M. Rider
LINEBARGER, HEARD, GOGGAN
BLAIR, GRAHAM, PEÑA & SAMPSON
P.O. Box 17428
Austin, Texas 78760

***CERTIFIED MAIL/RRR***
***NO. 7099 3220 0001 2246 9828***

**DAVID C. GARZA**

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (the "Agreement") is made as of this 16th day of November, 2001, by and among:

The ESTATE OF LILLIAN A. SCHWARZ by GRADY F. HEROLD, SR., INDEPENDENT EXECUTOR, P.O. Box 584, Mercedes, Texas 78570-0584 ("**Seller**"); joined by KATHRYN LOUISE HEROLD, P.O. Box 393, Mercedes, Texas 78570-0393, DORIS JEAN SHANNON, 2414 Standing Oak Drive, Richmond, Texas 77469, PEGGY LORRAINE BIRCH, 2360 Anise, El Paso, Texas 79936, and RUBY LEE WELLS, 912 West 9th, Weslaco, Texas 78596, beneficiaries of the Estate of Lillian A. Schwarz, Deceased, such beneficiaries joining in this Agreement for the limited purpose of consenting to and authorizing the Estate to enter into and consummate this Agreement and sale, but Beneficiaries shall not be responsible for, or liable for performance under this Agreement, and

LEGENDARY SPI, INC., a Florida corporation ("**Purchaser**") whose address is 4460 Legendary Drive, Suite 400, Destin, FL 32541.

In consideration of the mutual covenants and provisions herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## ARTICLE I

## THE PROPERTY

1.1 Agreement to Purchase. Seller hereby agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, in accordance with the terms and subject to the conditions contained herein, certain parcels of real property situated in Cameron County, Texas, more particularly described in Exhibit "A" attached hereto and incorporated by reference herein (the "**Land**"), together with any improvements located thereon and all appurtenances pertaining thereto including without limitation all littoral and riparian rights, all development rights, and all rights, title and interest of Seller in and to any easements, licenses, privileges, adjacent streets, roads, alleys or rights of way pertaining thereto, save and except all prior reservations of oil, gas, and other minerals, and subject to easements, rights-of-way, and prescriptive rights of record as of the date hereof (the Land, any improvements thereon, and all such appurtenant rights are called herein the "**Property**").

Exhibit "A"

ARTICLE II

PURCHASE PRICE

2.1 Purchase Price. The total purchase price for the Property shall be five million, five hundred thousand dollars ($5,500,000) (the **"Purchase Price")**.

2.2 Payment of Purchase Price. Purchaser shall pay to Seller the entire Purchase Price at Closing in immediately available funds; provided that Purchaser shall receive a credit against the Purchase Price at Closing equal to Purchaser's "Investment Cost" in the Property, as such cost is defined in Section 3.5. In lieu of an earnest money deposit, Purchaser has undertaken obligations hereinafter set forth with respect to inspection and evaluation of the Property and with respect to purchase of certain existing tax liens against the Property. The parties acknowledge that those obligations and others as set forth in this Agreement constitute valid consideration for this Agreement.

ARTICLE III

EXISTING TAX LIENS

3.1 Local & State Taxes. The Property is subject to liens for ad valorem taxes (the "**Ad Valorem Liens**") levied by Cameron County, Texas and certain other local taxing authorities and is subject to liens for inheritance taxes due to the State of Texas (the "**Texas Tax Liens**"). The Ad Valorem Liens and the Texas Tax Liens are identified on Exhibit "B" attached hereto and incorporated herein. Within forty-five (45) days after the date of this Agreement, Purchaser shall purchase the Ad Valorem Liens from the taxing authorities; provided, however, that Purchaser's obligation to purchase the Ad Valorem Liens is subject to Purchaser being able to secure financing for such purpose on commercially reasonable terms. Seller hereby consents to such purchase and to the assignment of the Ad Valorem Liens to Purchaser and shall execute and deliver such documents as may be required under Texas laws to evidence such consent to the taxing authorities. During the pendency of the Agreement, Purchaser shall hold the Ad Valorem Liens and shall not take any action to foreclose the same unless a "Foreclosure Event" as defined in Section 3.3 below shall have occurred.

3.2 IRS Lien. The Property is subject to a statutory lien in the approximate amount of $4.5 million (the "**IRS Lien**") in favor of the United States Internal Revenue Service (the "**IRS**"), to secure obligations of the Seller for previously assessed estate taxes. Promptly after the execution of this Agreement, Purchaser and Seller shall open negotiations with the IRS for the resolution of the IRS Lien, in particular requesting the IRS to forbear foreclosure thereof during the Inspection Period provided to Purchaser under Article IV of this Agreement. If such negotiations are successful and an

appropriate forbearance agreement or enforceable understanding (the "**IRS Forbearance Agreement**") is executed with the IRS, then the parties shall proceed with the investigation of the Property and contemplated sale of the Property to Purchaser as provided for in this Agreement. The IRS Lien will be satisfied from Seller's proceeds at Closing, as shall be provided in the IRS Forbearance Agreement.

3.3 Foreclosure Event. The occurrence of any of the following shall be deemed a "Foreclosure Event" entitling Purchaser to the remedies set forth hereinafter:

(a) The failure of the parties to successfully negotiate and enter into the IRS Forbearance Agreement within one hundred eighty (180) days after the date of this Agreement; or

(b) Any breach or default under such IRS Forbearance Agreement which results in the IRS taking any steps to enforce its remedies pursuant to the IRS Lien; or

(c) Any action by either the IRS or the State of Texas to foreclose, respectively, the IRS Lien or the Texas State Lien; or

(d) The election of Purchaser not to purchase the Property pursuant to Article IV, followed by Seller's failure to repay Purchaser's Investment Cost within ninety (90) days thereafter; or

(e) Any default or breach by Seller under this Agreement.

Upon the occurrence of any Foreclosure Event, Purchaser may immediately exercise any remedy available to it as the owner of the Ad Valorem Liens, including without limitation, foreclosure thereof pursuant to Texas law. If Purchaser becomes the owner of the Property through foreclosure of the Ad Valorem Liens, Purchaser's obligations to Seller shall be governed by Section 3.4 below.

3.4 Purchaser's Obligations Following Foreclosure. In the event that a Foreclosure Event occurs and Purchaser elects to foreclose the Ad Valorem Liens, then Purchaser shall bid at such foreclosure sale an amount equal to the amount due under such Ad Valorem Liens. Purchaser shall not be obligated to bid in excess of that amount but may elect to do so. If Purchaser is the successful bidder and becomes the owner of the Property through foreclosure of the Ad Valorem Liens, Purchaser shall be obligated to Seller as follows:

(a) If Purchaser becomes the owner by foreclosure prior to its election whether to purchase the Property or not as set forth in Article IV below, Purchaser shall continue its evaluation of the Property in good faith. On or before expiration of the Inspection Period, Purchaser shall determine whether the Property is satisfactory and

suitable for development, all as provided in Article IV. If so, Purchaser shall pay Seller within thirty (30) days, in cash, the difference between the Purchase Price and Purchaser's "Investment Cost" as defined below. If Purchaser determines that the Property is not suitable, it shall notify Seller to that effect and shall immediately list the Property for sale to third parties. Upon any sale, Purchaser shall first recover its Investment Cost and shall then pay Seller any net proceeds received above such Investment Cost up to the amount of the Purchase Price.

(b) If Purchaser becomes the owner of the Property through foreclosure effected after a decision made by Purchaser pursuant to Article IV that the Property is not suitable, then Purchaser shall immediately list the Property for sale to third parties. Upon any sale, Purchaser shall first recover its Investment Cost plus a broker's fee of 5% of the sales price and shall then pay Seller any net proceeds received above such Investment Cost up to the amount of the Purchase Price. Seller may also seek to promote the sale of the Property and Purchaser agrees to accept any sale price which provides Purchaser with its Investment Cost and the broker's fee described above.

3.5 Investment Cost. As used herein Purchaser's "Investment Cost" in the Property shall be defined as the sum of:

(a) The price paid by Purchaser for acquisition of Ad Valorem Liens, together with all accrued interest thereon, not to exceed 8% per year, during the time held by Purchaser; plus

(b) All costs incurred by virtue of being an owner of the Property if Buyer acquires title by foreclosure, including, without limitation, Ad Valorem taxes, assessments, insurance and funds expended to protect or maintain the Property.

## ARTICLE IV

### Inspection and Investigation

4.1 Inspection. Purchaser shall have a period of up to eighteen (18) months after the date of this Agreement (the "**Inspection Period**") in which to inspect the Property and conduct any physical and feasibility studies desired by Purchaser, including without limitation, applications for and negotiation of the terms of, any governmental permits needed for development of the Property. Seller shall cooperate with Purchaser and join in any such applications for governmental permits as may be necessary. Purchaser shall pay the costs of all such inspections. In the event Purchaser, in its sole discretion, finds any aspect of the Property to be unacceptable during the Inspection Period, it may so notify Seller and this Agreement shall thereupon be terminated, subject to the provisions of Article III above. If Purchaser, in good faith, is able to make its determination as to whether to accept the Property prior to the





expiration of such 18-month period, then Purchaser shall so notify the Seller and the Inspection Period shall terminate prior to the end of such 18-month period upon delivery of such notification.

4.2 Repair and Indemnity. Purchaser agrees to repair any and all damage caused to the Property arising or resulting from such inspections, and to indemnify and hold Seller harmless from all claims or costs arising or resulting from such inspections. The provisions of this Paragraph shall survive and be enforceable by Seller after any termination of this Agreement.

4.3 Data and Information. All data and information pertaining to the Property which are produced by such investigations are hereinafter referred to as "**Work Product**". Should Purchaser fail to close the acquisition of the Property for any reason other than Seller's default, then Purchaser shall deliver all such Work Product to Seller and Purchaser shall assign its rights in such Work Product to Seller. Such Work Product generally includes, but is not limited to (1) Traffic Studies, (2) Engineering Studies, (3) Architectural Plans and Specifications, (4) Building Cost Analysis, (5) Market Studies and Demographics, (6) Environmental Studies, (7) Zoning Analysis, (8) Compliance with all governmental laws and regulations, and (9) Financing Alternatives.

4.4 Initial Information Provided By Seller to Purchaser. Seller shall provide to Purchaser any of the following items as are in the possession or control of Seller:

(a) All plans, drawings, permits, and reports relating to the Property including correspondence to the extent not subject to the attorney-client privilege and to the extent related to permits or prospects for permits for development of the Property;

(b) All existing surveys and maps of the Property;

(c) Copies of all studies, soil tests, audits and reports, and other information dealing with jurisdictional wetlands, and the environmental soil and subsurface conditions of the Property which are in Seller's possession or control, including any reports which Seller may have obtained from others.

## ARTICLE V

## TITLE POLICY; SURVEY

5.1 Title. Within sixty (60) days after the date hereof, Seller, at Seller's sole cost and expense, shall have caused the Title Company to issue and deliver to Purchaser an Owner's Title Policy Commitment (the "Title Report") accompanied by copies of all recorded documents relating to easements, rights-of-way, etc., affecting the Property, which Title Report shall commit to insure Purchaser's title to the full amount of

the Purchase Price upon consummation of the transaction contemplated by this Agreement. Purchaser shall have sixty (60) days after receipt of the title commitment within which to notify Seller in writing of any defects or objections to the title appearing in such commitment. Seller shall have sixty (60) days after receipt of Purchaser's notice to cure any title objections or defects so specified, and upon Seller's curing the same, the transaction shall be closed as provided herein. If Seller fails to remedy title objections or defects within such period of time, Purchaser may in its sole discretion either (a) terminate this Agreement; (b) waive such title objections or defects and consummate the Closing and receive a reduction in the Purchase Price for the reasonable reduction in value caused by such title objections and defects; or (c) postpone the Closing for a reasonable time to allow Seller additional time to remedy title defects or objections, and if thereafter Seller is still unable to remedy title defects or objections, at that time Purchaser may elect either (a) or (b). If Purchaser fails to object to the Title Report within the time specified herein, then the condition thereof shall be deemed to be acceptable and any objection thereto or defects therein shall be deemed to have been waived for all purposes.

5.2 Permitted Exceptions. It is understood and agreed that the Property is being sold by Seller to Purchaser free and clear of all liens, claims and encumbrances except for the hereinafter Permitted Exceptions, and it is further understood and agreed that the conveyance by Special Warranty Deed to be delivered by Seller at Closing shall be subject only to the following ("Permitted Exceptions"):

(a) Laws, ordinances and governmental regulations;

(b) Real estate taxes and assessments for the year of Closing; and

(c) Exceptions approved by Purchaser pursuant to Paragraphs 5.1, 5.3 and 5.4, and any other exceptions approved by Purchaser in writing.

5.3 Later Title Exceptions. In the event that an exception unacceptable to Purchaser is filed of record subsequent to the date of the title commitment and prior to Closing (a "Later Exception"), Seller shall send written notice of such Later Exception to Purchaser. Purchaser shall have the right to postpone the Closing for a period of thirty (30) days in order to give Seller sufficient time to satisfy, release, cure or remove such lien or exception. Upon Seller's cure, removal or bonding off of any such Later Exception, the Closing shall be scheduled upon ten (10) days written notice to Seller. If Seller is unable to cure, remove, bond off or otherwise dispose of any Later Exception, within such thirty-day period, Purchaser may in its sole discretion either (a) terminate this Agreement; (b) waive such objection to the Later Exception and proceed with the Closing and receive a reasonable reduction in value caused by such title objections and defects; or (c) postpone the Closing for a reasonable time to allow Seller additional time to remedy the Later Exception, and if thereafter Seller is unable to remedy such Later





Exception, at that time Purchaser may elect either (a) or (b).

5.4 Survey. Purchaser shall be responsible for obtaining a current staked boundary survey of the Property within nine (9) month of the Effective Date of this Agreement (the "Survey"). If the Survey shows (i) any encroachments on the Property or that improvements, if any, on the Property encroach on other lands; (ii) that the Property is not contiguous to a publicly dedicated right-of-way; or (iii) any other facts that adversely affect the value of the Property, Purchaser shall notify Seller in writing within sixty (60) days after Purchaser's receipt of the Survey specifying such defects. Seller shall have thirty (30) days after receipt of Purchaser's notice to cure such survey defects or objections so specified and upon Seller's curing the same, the transaction shall be closed as provided herein. If Seller fails to remedy survey defects or objections within such time period, Purchaser may in its sole discretion either (a) terminate this Agreement; (b) waive such survey defects or objections, and consummate the closing with a reduction in the Purchase Price for the reasonable reduction in value caused by such survey objections and defects; or (c) postpone the Closing for a reasonable time to allow Seller additional time to remedy said survey defects or objections, and if thereafter, Seller is still unable to remedy said survey defects or objections, at that time Purchaser must, within thirty (30) days, elect either (a) or (b). If Purchaser fails to object to the Survey within the time specified herein, then the condition thereof shall be deemed to be acceptable and any objection thereto or defects therein shall be deemed to have been waived for all purposes.

## ARTICLE VI

## REPRESENTATIONS, WARRANTIES, AND COVENANTS BY SELLER

PURCHASER HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT PURCHASER HAS OR WILL HAVE, PRIOR TO THE END OF THE INSPECTION PERIOD, THOROUGHLY INSPECTED AND EXAMINED THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY PURCHASER IN ORDER TO ENABLE PURCHASER TO EVALUATE THE PURCHASE OF THIS PROPERTY. PURCHASER HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT PURCHASER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION, AND EVALUATION OF THE PROPERTY BY PURCHASER AND THAT PURCHASER IS PURCHASING THE PROPERTY ON AN "AS IS," "WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS, WARRANTIES OR COVENANTS, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE; PROVIDED, HOWEVER, NOTHING CONTAINED IN THIS ARTICLE SHALL LIMIT THE WARRANTIES OF TITLE SET FORTH IN THE SPECIAL WARRANTY DEED TO BE DELIVERED FROM SELLER TO PURCHASER AT THE CLOSING.

## ARTICLE VII

## REPRESENTATIONS, WARRANTIES AND COVENANTS BY PURCHASER

7.1 Organization. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida.

7.2 Corporate Existence. Purchaser will keep in full force and effect its existence and all licenses and franchises necessary for the conduct of its business.

7.3 Enforceability of Agreement. Upon execution and delivery by Purchaser, this Agreement will be a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other law affecting creditors' rights generally or general principals of equity.

## ARTICLE VIII

## CLOSING

8.1 Closing. The Closing shall be held at the offices of Seller's attorneys, at a mutually agreeable time not later than thirty (30) days after expiration of the Inspection Period (the "**Closing Date**"), unless the parties mutually agree upon another place, time or date. If the principal bridge providing access to that portion of South Padre Island where the Property is located is unusable for any time period of over five (5) consecutive days, the date for the Closing shall, at Buyer's election, be postponed by such number of days as that bridge is unusable, up to, but not to exceed six months.

8.2 Conditions to Purchaser's Obligations. The obligation of Purchaser hereunder to consummate the Closing is subject to the satisfaction, as of the Closing, of each of the conditions set forth below:

(a) Accurate Understanding. The following shall be true and correct on the Closing Date:

a. Authority. The individuals executing this Agreement has full and lawful authority to bind and obligate Seller to perform its obligations as herein provided and upon execution hereof, this Agreement shall be the binding and legal obligation of Seller and is enforceable against Seller under the laws of the State of Texas.

b. Marketable Title. Seller shall convey and deliver at Closing good and marketable title to the Property to Purchaser by Special Warranty Deed, in form and content acceptable to Purchaser, free and clear of all mortgages, liens, encumbrances, leases, tenancies, security interests, covenants, conditions, restrictions, rights-of-way, easements, judgments and other matters affecting title except for the Permitted Exceptions.

c. No Condemnation Pending or Threatened. There is no pending or threatened condemnation or similar proceeding affecting the Property or any portion thereof, nor does Seller have knowledge that such action is presently contemplated.

d. Compliance With Laws. Seller has complied with all applicable laws, ordinances, regulations, rules and restrictions pertaining to and affecting the Property. Performance of this Agreement will not result in any breach of or constitute any default under or result in the imposition of, any lien or encumbrance upon the Property under any agreement or other instrument to which Seller is a party or to which Seller or the Property might be bound.

e. Pending Litigation. There are no legal actions, suits, or other legal or administrative proceedings including condemnation cases pending or threatened, against the Property or Seller, and Seller is not aware of any facts which might result in any such action, suit or other proceedings.

f. No Special Assessments or Obligations for Improvements. No portion of the Property is affected by any special assessments or obligations for roads or other improvements. To the extent required, all off-site improvements, streets, roadways and utility services and installations incidental to or connected with the use and improvement of the Property and any part thereof have been completed.

g. Access to Highways and Roads. The Property has full, free and adequate legal ingress and egress to publicly maintained and dedicated streets and Seller has no knowledge of any fact or condition which would result in the termination of such ingress and egress. Moreover, if the principal bridge providing access to that portion of South Padre Island where the Property is located is unusable for any time period of over five (5) consecutive days, the date for the Closing shall, at Buyer's election, be postponed by such number of days as that bridge is unusable, up to, but not to exceed six months.





h. Commitments to Governmental Authority. To Seller's knowledge, no commitments have been made to any governmental authority, developer, utility company, school board, church or other religious body or any property owners' association or to any other organization, group or individual relating to the Property which would impose an obligation upon Purchaser or its successors and assigns to make any contribution or dedications of money or land or to construct, install or maintain any improvements of a public or private nature on or off the Property; and there is no requirement that any developer or owner of the Property pay directly or indirectly any special fees or contributions or incur any expenses or obligations in connection with any development of the Property or any part thereof. The provisions of this section shall apply to any regular or non-discriminatory local real estate taxes assessed against the Property.

i. Subsurface Conditions. There are no environmental, soil or subsurface conditions located on the Property which would materially impair the useability or developability of the Property.

j. Leases; Contracts. There are no leases, rights of first refusal, options or contracts, oral or written, in existence pertaining to the Property.

k. Hazardous Waste. Neither Seller, nor any affiliate or agent of Seller, nor any other person has ever caused or permitted any "Hazardous Material" (as hereinafter defined) to be placed, held, located or disposed of on, under or at the Property or any part thereof, and neither the Property nor any part thereof has been used as a dump site or storage site, whether permanent or temporary, for any hazardous material, as used herein, the term "Hazardous Material" shall mean any hazardous, toxic or dangerous waste, substance or material defined as such in or for the purposes of the Comprehensive Environmental Response Compensation and Liability Act of 1980 ("CERCLA"), The Resource Conservation Recovery Act ("RCRA"), the Superfund Amendment Reauthorization Act ("SARA"), any so-called superfund or superlien law, or any other federal, state or local statute law, ordinance, code, rule, regulation, order, decree, regulating, relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, as now or any time hereafter in effect (the "Environmental Laws").

l. No Adverse Change. No material adverse change shall have occurred with respect to the Property or its ability to be developed as Purchaser intends, between the date hereof and the Closing Date,

including without limitation, the existence or threat of any proposed or enacted zoning change, building moratoria, injunctions or other governmental requirements of any kind which would prohibit Purchaser's development of the Property.

m. <u>IRS Forbearance Lien Agreement</u>. No default shall have occurred under the IRS Forbearance Agreement and such Agreement shall remain in full force and effect.

n. <u>Endangered Species</u>. Purchaser shall have obtained confirmation satisfactory to Purchaser, in Purchaser's sole and absolute discretion, that the Property is not subject to any law, ordinance, regulation, policy or other requirement protecting endangered or threatened animal or plant species.

o. <u>Seller's Compliance</u>. Seller shall have performed, observed and complied with all of the covenants, agreements and conditions required by this Agreement to be performed, observed and complied with by the Seller prior to or as of the Closing.

p. <u>Insolvency</u>. There has not been filed by or against Seller or Seller's predecessor in title to the Property, a petition in bankruptcy or any other insolvency proceeding, or for the reorganization or appointment of a receiver or trustee, nor has Seller made an assignment for the benefit of creditors (this provision shall not refer to a mortgage creating the IRS Lien), nor filed a petition for arrangement, nor entered into an arrangement with creditors, nor admitted in writing its inability to pay debts as they become due.

q. <u>Violations</u>. Seller has not received any notices from any association, city, village, state or other governmental authority of building, land use, zoning or health code violations in respect to the Property that have not been corrected.

r. <u>Boundaries</u>. There is no pending litigation or dispute involving or concerning the location of the boundaries of the Property.

8.3 <u>Seller's Covenants Pending Closing</u>. Following the execution of this Agreement and at all times prior to the Closing so long as Seller owns the Property:

(a) Seller shall maintain the Property essentially in the same manner as heretofore conducted, and shall refrain from disposing of the Property or otherwise entering into any transaction inconsistent with the transactions contemplated by this Agreement.

(b) Neither Purchaser, Seller nor any broker shall issue any press releases nor make any public statement, public announcement or public disclosure of any kind concerning the subject matter hereof or the status of negotiations conducted hereunder except as may be jointly agreed to by Seller and Purchaser or as either of them may consider necessary in order to satisfy the requirements of applicable law. The foregoing restrictions shall apply both before and after the Closing. This section shall survive Closing.

(c) Seller shall not transfer, sell, assign or otherwise dispose of or pledge, mortgage, hypothecate or otherwise encumber or lease or sublease all or any portion of the Property or any interest therein.

(d) Seller shall not take any action which would cause any of the conditions precedent to Purchaser's obligations to fail to be met, and Seller agrees to keep Purchaser informed of the occurrence of any event which comes to its attention which may cause such conditions precedent to fail to be satisfied in any material way.

(e) Seller shall maintain liability insurance with respect to the Property in full force and effect until the Closing.

(f) Seller will not take any action or omit to take any action which action or omission would cause a material breach by it of any material contract, commitment or obligation with respect to the Property or amend or terminate any such contract, commitment or obligation without the prior written consent of Purchaser.

(g) In the event that there shall be any notices of violations of law, ordinances, orders, or governmental regulations issued by any federal, state, county, municipal or other governmental or quasi-governmental department, agency or authority relating to the Property, Seller will provide written notice thereof to the Purchaser and Seller will cause the same to be complied with, at Seller's sole cost and expense prior to the Closing, or Seller shall escrow sufficient funds at Closing or make such other arrangements as may be possible to reasonably effect compliance therewith.

8.4 Seller's Obligations at Closing. At Closing, Seller shall deliver or cause to be delivered to Purchaser the following documents:

(a) Special Warranty Deed executed by Seller conveying the Property to Purchaser, together with the allocation of developer or development rights associated therewith, free and clear of all encumbrances other than the Permitted Exceptions;

(b) Assignment of all of Seller's right, title and interest, if any, in and to all permits, plans, and other rights and privileges relating to the Property;

(c) Affidavit stating either that there have been no improvements made to the Property during the ninety (90) days immediately preceding the Closing pursuant to a contract with Seller or, if there have been any such improvements, that all lienors in connection with such improvements have been paid in full;

(d) Such additional documents and instruments as the title company may reasonably require to transfer and insure the title to the Property; and

(e) Such other documents or instruments as Purchaser may reasonably request in order to effectuate the transactions contemplated herein.

8.5 Purchaser's Obligations at Closing. At Closing, Purchaser shall deliver to Seller the following:

(a) The Purchase Price in accordance with the provisions of Article II; and

(b) Copy of Purchaser's corporate documents, and all amendments thereto, certified as true and complete, as of the closing date, and all other documents deemed necessary by the title company so as to evidence authorization for the actions to be taken by Purchaser or Purchaser's assignee, as well as the authority of the person signing this Agreement, the Purchase Money Loan Documents, and the closing documents.

8.6. Failure to Satisfy Conditions; Covenants. In the event of a failure of any of the conditions precedent under Section 8.2 to be met or of Seller to perform all of Seller's covenants under Section 8.3, then Purchaser may in its sole discretion either (a) terminate this Agreement; (b) waive such failure and consummate the Closing and receive a reduction in the Purchase Price for the reasonable reduction in value caused by such failure; or (c) postpone the Closing for a reasonable time to allow Seller additional time to remedy the failure, and if thereafter Seller is still unable to remedy the failure, at that time Purchaser may elect either (a) or (b).





ARTICLE IX

CLOSING COSTS, PRORATIONS OF RENTS, TAXES AND MISCELLANEOUS EXPENSES

9.1 Closing Costs. Purchaser and Seller shall each pay their own attorney's fees. At Closing, Seller shall pay the costs of the Title Insurance. At the Closing, Purchaser shall pay costs of recording the Special Warranty Deed, all documentary stamp taxes and intangible taxes due with respect to any mortgage financing obtained by Purchaser and the costs of the Survey.

9.2 Real Property Taxes. Real estate taxes on the Property and any other taxes or fees associated with the Property for the year of closing shall be prorated as of the Closing. Seller shall pay all real estate and personal property taxes for the period ending on the day immediately preceding the Closing and Purchaser shall be responsible for all such taxes from and after the Closing. If the tax bill for the year of closing has not been issued prior to Closing, such taxes shall be prorated based upon the tax bill issued for the previous year, with known changes, if any. If any such taxes are due for years prior to the year of Closing, such taxes shall be the responsibility of Seller.

9.3 Assessments, Liens and Other Expenses. All assessments, liens or other expenses that relate to or are associated with the Property shall be prorated as such assessments, liens or other expenses are customarily prorated in similar transactions in Cameron County, Texas.

9.4 Survival. All of the provisions of Article IX shall survive Closing.

ARTICLE X

RISK OF LOSS

10.1 Casualty. Seller assumes all risk and liability, damage to or injury occurring to the Property by fire, storm, accident or any other casualty or cause until the Closing has been consummated. If the Property or any part thereof, suffers any damages prior to the Closing from fire or other casualty, Purchaser may either (a) terminate this Agreement, in which event the parties shall have no further rights and liabilities hereunder except with respect to those matters specifically surviving termination or Closing; (b) require Seller to repair such damage, in which event the time for Closing shall be extended by the length of time reasonably necessary for Seller to complete such repairs; or (c) without repairing such damage, consummate the Closing, in which latter event the proceeds of any insurance covering such damage shall be assigned to Purchaser at Closing.





10.2 Condemnation. If, prior to Closing, action is initiated or threatened to take a material part of the Property by eminent domain proceedings or by deed in lieu under threat thereof, Purchaser may either (a) terminate this Agreement, in which event the parties shall have no further rights or obligations hereunder except those matters specifically surviving termination or Closing; (b) consummate the Closing in which latter event any award received or to be received by Seller from the condemning authority shall be assigned to Purchaser at the Closing; or (c) postpone the Closing until the condemnation proceedings have been completed, and at that time Purchaser may elect either (a) or (b) above. For purposes hereof, a "material part" shall be deemed to mean a taking which (i) changes the current use of the Property, or (ii) physically affects more than ten percent (10%) of the available square footage of the Property. In any event, Purchaser shall be entitled to receive from any condemnation proceeds an amount equal to Purchaser's Investment Cost.

## ARTICLE XI

## DEFAULT

11.1 Default by Seller. If Seller breaches this Agreement, Purchaser may (a) terminate this Agreement, or (b) seek and obtain specific performance of this Agreement, together with all costs and attorneys' fees as its sole and exclusive remedy and relief.

11.2 Breach by Purchaser. If Purchaser breaches this Agreement, Seller shall be entitled to (a) terminate this Agreement, or (b) pursue an action for specific performance of Purchaser's obligations as its sole and exclusive remedy and relief.

## ARTICLE XII

## MISCELLANEOUS

12.1 Notices. All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be deemed received (a) when personally delivered to the party to receive such notice or (b) whether actually received or not, one (1) business day after deposit with a commercial express delivery service, with delivery costs prepaid, or three (3) days after deposit in any post office or mail receptacle regularly maintained by the United States Government, certified or registered mail, return receipt requested, postage prepaid, addressed as shown in the introductory section of this Agreement.

12.2 Broker. Each party represents to the other party that neither it nor any of its agents, affiliates, shareholders or partners have dealt with any person or entity that might have a claim for sales or brokerage commission or finder's fee with respect to the transaction contemplated by this Agreement. The parties hereto agree that each party will indemnify, hold harmless and defend the other from and against any additional claim for any such commission or fee by any other broker or similar person or entity claiming to have acted through the other party or its agents, affiliates, shareholders, or partners. Notwithstanding the foregoing, Robert S. Dubose and Wells Real Estate, Inc. introduced the Purchaser and Seller and will receive commissions to be due only upon Closing and to be paid by the Seller. Wells Real Estate, Inc. will receive a commission of 1.5% of the Purchase Price at Closing. Robert S. Dubose will receive a commission of 2% of the Purchase Price at Closing regardless of the date of Closing, and Robert S. Dubose will receive an additional commission of 0.5% of the Purchase Price (for a total commission to Robert S. Dubose of 2.5%) if the Closing occurs within fourteen (14) months of the Effective Date of this Agreement. The provisions of this Section shall survive Closing.

12.3 Entire Agreement. This Agreement and the Exhibits hereto embody the entire agreement between the parties relative to the subject matter, and there are no oral or written agreements between the parties, nor any representations made by either party relative to the subject matter, which are not expressly set forth herein.

12.4 Amendment. This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

12.5 Right of Set-Off. Purchaser shall have the right to off-set against its obligations to Seller, any rights or claims against Seller arising out of this Agreement.

12.6 Headings. The captions and headings used in this Agreement are for convenience only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement.

12.7 Time of the Essence. TIME IS OF THE ESSENCE OF THIS AGREEMENT. However, if the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the law of the United States or the State of Texas, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

12.8 Governing Law. This Agreement shall be construed in accordance with and governed by the laws of the State of Texas and the laws of the United States pertaining to transactions in Texas.

12.9 Successors and Assigns. This Agreement shall bind and inure to the benefit of Seller, Purchaser and their respective heirs, executors, administrators,

personal legal representatives, successors and assigns. Purchaser may assign Purchaser's rights under this Agreement.

12.10 Invalid Provision. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid or unenforceable provision or by its severance from this Agreement.

12.11 Attorneys' Fees. In the event it becomes necessary for either party hereto to file suit to enforce this Agreement or any provision contained herein or any matter with respect to the Property, the party prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages as herein provided, reasonable attorneys', paralegals', or expert witnesses' fees and costs incurred in such suit at trial or on appeal or in connection with any bankruptcy or similar proceedings.

12.12 Multiple Counterparts. This Agreement may be executed in a number of identical counterparts, each of which for all purposes is deemed an original, and all of which constitute collectively one (1) agreement, but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

12.13 Non-Merger. In addition to the specific language of non-merger found in certain sections of this Agreement, any provision hereof which by its terms would be performed after Closing shall survive the Closing and shall not merge in the Closing or in the General Warranty Deed, except as specifically provided to the contrary herein.

12.14 Recording of this Agreement. Purchaser may record a short form notice or memorandum of this Agreement in the public records of Cameron County, Texas or in any other appropriate office or place of recording.

12.15 Waiver of Jury Trial. EACH PARTY TO THIS AGREEMENT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED UPON THIS AGREEMENT OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER AGREEMENT CONTEMPLATED AND EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF DEALING, COURSE OF CONDUCT, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO.

12.16 Marketing Signs. So long as Purchaser is not in default under this Agreement, Purchaser shall be entitled to erect and maintain one or more signs on the Property for the purpose of advertising the Intended Use or the availability of the

Property for sale or lease. Purchaser's signs shall comply with all applicable sign ordinances. In the event of a default by Purchaser under this Agreement, or in the event this Agreement is terminated for any reason, Purchaser agrees to promptly thereafter remove such signs and restore the Property to its prior condition.

12.17 Judicial Interpretation. Should any of the provisions of this Agreement require judicial interpretation, the Court interpreting or construing the same shall not apply the presumption that the terms thereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the party who itself or through its agents prepared the same, it being agreed that the agents of all parties have participated in the preparation thereof.

12.18 No Assumptions of Seller's Liabilities. Purchaser is acquiring only the Property from Seller. Purchaser does not assume or agree to pay, or indemnify the Seller or any other person or entity against, any liability, obligation, or expense of the Seller or relating to the Property in any way except only to the extent, if any, herein expressly and specifically provided.

12.19 Effective Date. The Effective Date means the date of execution of this Agreement by the last of Seller and Purchaser to execute same.

12.20 Compliance. In accordance with the requirements of Section 20 of the Texas Real Estate License Act, Purchaser is hereby advised that he should be furnished with or obtain a policy of title insurance or Purchaser should have the abstract covering the Property examined by an attorney of Purchaser's own selection.

12.21 Notice To Purchaser As To Laguna Madre Water District. The real property described in this Contract, which you are about to purchase is located in the Laguna Madre Water District. The District has taxing authority separate from any other taxing authority, and may, subject to voter approval, issue an unlimited amount of bonds and levy an unlimited rate of tax in payment of such bonds. As of this date, the rate of taxes levied by the District on real property located in the District is $0.243996 on each $100 of assessed valuation. The total amount of bonds which has been approved by the voters and which have been or may, at this date, be issued is $11,935,814.00, and the aggregate initial principal amounts of all bonds issued for one or more of the specified facilities of the District and payable in whole or in part from property taxes is $11,935,814.00. The purpose of this District is to provide water, sewer, drainage, and flood control facilities and services within the District through the issuance of bonds payable in whole or in part from property taxes. The cost of these utility facilities is not included in the purchase price of your Property, and these utility facilities are owned or to be owned by the District. The District also has the authority to adopt and impose a standby fee on property in the District that has District-financed water, sewer, sanitary, or drainage facilities and services available but not connected and which does not have a house, building, or other improvements located thereon and does not substantially

utilize the utility capacity available to the Property. The District may exercise the authority without holding an election on the matter. As of this date, there is no standby fee charged. An unpaid standby fee is a personal obligation of the person that owned the Property at the time of imposition and is secured by a lien on the Property. Any person may request a certificate from the district stating the amount, if any, of unpaid standby fees on a tract of property in the District.

12.22 Disclosure to Purchaser of Property Seaward of Gulf Intracoastal Waterway. The real property described in this Contract is located seaward of the Gulf Intracoastal Waterway to its southernmost point and then seaward of the longitudinal line also known as 97 degrees, 12', 19" which runs southerly to the international boundary from the intersection of the centerline of the Gulf Intracoastal Waterway and the Brownsville Ship Channel. If the Property is in close proximity to a beach fronting the Gulf of Mexico, the Purchaser is hereby advised that the public has acquired a right of use or easement to or over the area of any public beach by prescription, dedication, or presumption, or has retained a right by virtue of continuous right in the public since time immemorial, as recognized in law and custom.

The extreme seaward boundary of natural vegetation that spreads continuously inland customarily marks the landward boundary of the public easement. If there is no clearly marked natural vegetation line, the landward boundary of the easement is as provided by Sections 61.016 and 61.017, Natural Resources Code.

State law prohibits any obstruction, barrier, restraint, or interference with the use of the public easement, including the placement of structures seaward of the landward boundary of the easement. STRUCTURES ERECTED SEAWARD OF THE VEGETATION LINE (OR OTHER APPLICABLE EASEMENT BOUNDARY) OR THAT BECOME SEAWARD OF THE VEGETATION LINE AS A RESULT OF NATURAL PROCESSES ARE SUBJECT TO A LAWSUIT BY THE STATE OF TEXAS TO REMOVE THE STRUCTURES.

The Purchaser is hereby notified that the Purchaser should seek the advice of an attorney or other qualified person before executing this Contract or instrument of conveyance as to the relevance of these statutes and facts to the value of the Property the Purchaser is hereby purchasing or contracting to purchase.

12.23 Notice Regarding Coastal Area Property. IN ACCORDANCE WITH SECTION 33.135, TEXAS NATURAL RESOURCES CODE, THE FOLLOWING NOTICE IS INCLUDED AS PART OF THE CONTRACT:

(1) The real property described in and subject to this Contract adjoins and shares a common boundary with the tidally influenced submerged lands of the state. The boundary is subject to change and can be determined accurately only by a survey on the ground





made by a licensed state land surveyor in accordance with the original grant from the sovereign. The owner of the Property described in this Contract may gain or lose portions of the tract because of changes in the boundary.

(2) The Seller, transferor, or grantor has no knowledge of any prior fill as it relates to the Property described in and subject to this Contract.

(3) State law prohibits the use, encumbrance, construction, or placing of any structure on, in, or over state-owned submerged lands below the applicable tide line, without proper permission.

(4) Purchaser or grantee is hereby advised to seek the advice of an attorney or other qualified person as to the legal nature and effect of the facts set forth in this notice on the Property described in and subject to this Contract. Information regarding the location of the applicable tide line as to the property described in and subject to this Contract may be obtained from the surveying division of the General Land Office in Austin.

12.24 Acceptance of this Agreement. This Agreement shall be null and void unless Seller delivers to Purchaser evidence of the execution of this Agreement without amendment no later than 5:00 P.M., E.S.T., November 21, 2001.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date shown below.

**SELLER**

LILLIAN A. SCHWARZ ESTATE
[Print or Type Name]

By [signature]
Its INDEPENDENT EXECUTOR

[Print or Type Name]

Dated November 16, 2001

**PURCHASER**

LEGENDRY SPI, INC.
a Florida corporation

By: ______________________
Peter H. Bos, President

Dated ______________________, 2001

______________________
Dwight C. Lorenzen
[Print or Type Name]

______________________
Wendy Parker
[Print or Type Name]

**EXHIBIT A**

**"LAND"**

**EXHIBIT B**

"AD VALOREM LIENS"

w:\misc\PS 11.14.01.doc